Eugene G. Iredale SBN: 75292
Julia Yoo  SBN: 231163
IREDALE & YOO, APC
105 West F Street, 4th Floor
San Diego, CA 92101-6036
Tel: (619) 233-1525
Fax: (619) 233-3221
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Dana M. Sabraw)

| | |
|---|---|
| M.G., F.M., L.A., J.M., L.G., F.B., M.N., R.G., L.S., and E.R., individuals,<br><br>        Plaintiffs,<br><br>v.<br><br>METROPOLITAN INTERPRETERS and TRANSLATORS, INC., a corporation, J.C., an individual, L.L., an individual, R.P., an individual, M.L, an individual, B.A., an individual, UNITED STATES OF AMERICA, EILEEN ZEIDLER, an individual, SONDRA HESTER, an individual, DAREK KITLINSKI, an individual,  WILLIAM R. SHERMAN, an individual, and DOES 1-20, inclusive,<br><br>        Defendants. | Case No.:  12-cv-00460-DMS-MDD<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1)  VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT 29 USC § 2002 (1)**<br><br>**(2)  VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT 29 USC § 2002 (2)**<br><br>**(3)  VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT 29 USC § 2002 (3)**<br><br>**(4)  CIVIL CONSPIRACY**<br><br>**(5)  FRAUD**<br><br>**(6)  NEGLIGENT MISREPRESENTATION**<br><br>**(7)  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**(8)  NEGLIGENCE**<br><br>**(9)  PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**<br><br>JURY TRIAL IS HEREBY DEMANDED |

1    COME NOW, Plaintiffs M.G., F.M., L.A., J.M., L.G., F.B., M.N., R.G., L.S., and E.R.

2    and allege and complain as follows:

3                                              **I.**
                                     **INTRODUCTION**

4

5        Plaintiffs worked as linguists for Metropolitan Interpreters and Translators, Inc.

6    ("Metropolitan"), a private corporation that contracted with various governmental agencies

7    nationwide.  Metropolitan had a contract with the Drug Enforcement Administration and

8    Immigration and Customs Enforcement in San Diego.  Plaintiffs, as employees of Metropolitan,

9    provided translation services for DEA and ICE in San Diego County.  In 2011, Metropolitan and

10   DEA requested, required and demanded that all linguists working in their San Diego and

11   Imperial County offices take polygraph exams.  Defendant B.A., the Metropolitan site supervisor

12   in San Diego, made all arrangements for Plaintiffs take the DEA administered polygraph exams

13   as a condition of employment.  If the employees "failed" or refused the test, or had inconclusive

14   results, they would lose their "clearance" to be in the DEA offices, meaning that they would be

15   terminated from their jobs.

16       Metropolitan was not conducting an investigation involving economic loss to

17   Metropolitan.  Nor did Metropolitan have any individualized suspicion that any of the Plaintiffs

18   had committed a crime or engaged in wrongdoing.  Rather, Defendants imposed the blanket

19   requirement that every linguist in San Diego and Imperial County take polygraphs. Defendants

20   provided no written material to Plaintiffs which explained the purpose of these mandatory tests

21   nor the basis for any investigation or suspicion; nor did Defendants give written notice of the

22   employees' rights under federal and state law.

23       One of the polygraphers, Defendant Eileen Zeidler, asked grossly inappropriate and

24   personal questions to some of the Plaintiffs.  These questions were demeaning and humiliating.

25   DEA agents pressured Plaintiffs into "telling the truth" or accused Plaintiffs of lying.  Agents

26   escorted Plaintiffs out of the building in a humiliating fashion after they "failed" the polygraph.

27       The polygraph testing in this case was prohibited by the Employee Polygraph

28   Protection Act of 1988, 29 U.S.C. §§ 2001, *et seq*. ("EPPA")  Defendants effectively terminated

Plaintiffs from their employment either for "failing" the polygraph test, having an inconclusive test result, or refusing to submit to the examination.

## II.
## GENERAL ALLEGATIONS

1.      Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 29 U.S.C. §§ 2001 *et seq*.

2.      This Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367(a).

3.      Plaintiffs' claims under 28 U.S.C. §§ 1346, and 2671-2680 (Federal Tort Claims Act) against the United States were timely filed. These claims are deemed denied by operation of law.

4.       Venue is proper in the Southern District of California pursuant to 28 U.S.C. §1391(b), because at all times relevant hereto, a substantial part of the events or omissions giving rise to the subject of the action occurred in San Diego County.

## III.
## PARTIES

5.      At all times relevant to this complaint, Plaintiffs were individuals residing in San Diego County, California.

6.      At all times relevant to this complaint, Defendant METROPOLITAN INTERPRETERS and TRANSLATORS, INC. (hereinafter "METROPOLITAN") was a nationwide corporation operating throughout the United States, including San Diego County, California and employing the individual Defendants who were acting within the course and scope of their employment.

7.      Defendant J.C. was the Vice President of Defendant METROPOLITAN.

8.      Defendant L.L. was an employee of Defendant METROPOLITAN and the head of Human Resources and Security.

9.      Defendant R.P. was an employee of Defendant METROPOLITAN and a supervisor.

10. Defendant M.L. was an employee of Defendant  METROPOLITAN and the supervisor of B.A.

11. Defendant B.A. was an employee of Defendant  METROPOLITAN and the site supervisor in San Diego.

12. The individual defendants participated in, promoted, approved and executed Metropolitan's corporate policy in contravention of the EPPA.

13. At all times relevant to this complaint, the Drug Enforcement Agency (DEA) was a federal agency of defendant UNITED STATES OF AMERICA and was operating in San Diego County, California.

14. At all times relevant to this complaint, Defendants EILEEN ZEIDLER, SONDRA HESTER, DAREK KITLINSKI, and WILLIAM R. SHERMAN were employees or agents of the DEA.

15. Plaintiffs are truly ignorant of the true names and capacities of DOES 1 through 20, inclusive, and/or are truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities and the facts giving rise to their liability have been ascertained.

16. These defendants were agents, servants and employees of other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants.  Each of the defendants had approved or ratified the actions of the other defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

### IV.
### FACTS

17. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

18. Defendant Metropolitan describes itself as the "largest provider of translators, transcription and interpretation services to the law enforcement community, government agencies

and private corporations nationwide." It has offices in New York, Miami, Los Angeles, San Diego, Washington D.C. and Scottsdale, Arizona. Its corporate headquarters are located in New York.  Defendant Metropolitan is engaged in commerce within the meaning of 18 U.S.C. § 2001.

19.     Plaintiffs were linguists working for Metropolitan who had been thoroughly screened, vetted and subjected to security clearance checks before being hired.

20.     After a thorough background investigation before hiring, Plaintiffs were given "Law Enforcement Access" which allowed to them to enter the premises of DEA offices.

21.     In 2011, Defendants requested, required and demanded all linguists in San Diego and Imperial County submit to polygraph tests.

22.     A private employer is prohibited from requesting, requiring or demanding a polygraph test from an employee under the Employee Polygraph Protection Act, 29 USC §§ 2001, *et seq.*

23.     While the Federal government is exempt from the EPPA with respect to government employees, it is subject to the EPPA requirements with respect to the employees of its private contractors.

24.     29 CFR 801.10(d) explicitly provides that : "This exclusion from the Act applies only to the federal, state and local government entity with respect to its own public employees. Except as provided in sections 7(b) and (c) of the Act, and § 801.11 of the regulations, this exclusion does not extend to contractors or non-governmental agents of a government entity, nor does it extend to government entities with respect to employees of a private employer with which the government entity has a contractual or other business relationship."

25.     Exclusions from the Act apply only to Department of Defense contractors; Department of Energy contractors with respect to the "atomic energy defense activities" of the DOE; the National Security Agency; the Central Intelligence Agency; and contractors of the FBI engaged in performance of work related to counter intelligence (defined as activities designed to protect against espionage, sabotage, terrorist activities or assassination).

26.     There is an exclusion for contractors' employees whose duties involve access to

information that has been classified at the level of top secret or designated as being within a special access program under section 4.2(a) of Executive Order 12356 (or a successor Executive Order).

27.     Plaintiffs did not fall within any exclusion to the EPPA. Plaintiffs' duties did not involve access to information which was classified as "top secret."

28.     Plaintiffs' duties as translators involved access only to non-classified information which is defined as "Law Enforcement Sensitive."

29.     While such information may properly be restricted and its unauthorized dissemination proscribed, "Law Enforcement Sensitive" information is not classified information.

30.     Plaintiffs' duties did not involve access to information which was designated as being within a "special access program under §4.2(a) of Executive Order 12356."  Such a special access program involves limitation of access to national defense information, intelligence activities, or other "particularly sensitive information classified pursuant to Executive Order 12356 ."

31.     Wiretap transcripts are not classified information. Were they classified, any criminal case involving wiretaps would require declassification of the intercepted conversations under cumbersome administrative procedures before disclosure to the defendant, counsel, or to the court.

32.     Metropolitan could properly vet, investigate and screen Metropolitan employees who were to be involved in translation of Title III intercepts. Metropolitan and its client, the DEA, could legally enforce requirements of confidentiality and limitation of access to Title III intercepts.

33.     These intercepts, however, were not, under the EPPA, within the limited and highly restricted category which exempted Metropolitan or the DEA from the legal requirements of the EPPA.

34.     While Metropolitan and DEA could legally use any reasonable investigative or

security procedure to screen employees or ensure the secrecy of Title III intercepts, the EPPA legally forbids the use of the polygraph in those efforts.

35.    While the DEA is exempted from the EPPA requirements with respect to its own employees, it is prohibited from requesting, requiring or demanding that a private contractor's employees submit to a polygraph under 29 USC §§ 2001, *et seq* unless the contractor falls under specified statutory exceptions, none of which apply in this case.

36.    The DEA's actions in requesting, demanding and in performing polygraphs were clearly illegal.

37.    Instead of declining to force its employees into submitting to illegal polygraphs, Metropolitan Defendants agreed with, participated with, and aided and abetted the DEA in the violations of law described in this complaint.  Metropolitan, J.C., L.L., R.P., M.L., and B.A. engaged in a civil conspiracy to violate the laws as described.

38.    Metropolitan coordinated the testing; scheduled the tests for its employees; communicated with the employees regarding the tests; presented the order in which the tests would be given to the employees; and discharged the employees after they "failed" or refused the test or had inconclusive test results.

39.    Defendant Eileen Zeidler administered the tests, without complying with the requirements under 29 USC § 2007 (b).

40.    Defendant Eileen Zeidler not only administered the tests, but she participated in the planning, design, and execution of the scheme to violate the EPPA.  She was instrumental in formulating the content of the questions, the sequence of testing and coordination of improper interrogation techniques before, during and after the examinations.

41.    Defendant Eileen Zeidler failed during the pretest phase, to provide reasonable written notice of the date, time, and location of the test, and of Plaintiffs' right to obtain and consult with legal counsel or an employee representative before each phase of the test; failed to inform Plaintiffs in writing of the nature and characteristics of the tests and of the instruments involved; failed to inform Plaintiffs  in writing whether the testing area contains a two-way

mirror, a camera, or any other device through which the test can be observed; whether any other device, including any device for recording or monitoring the test, will be used; and failed to inform Plaintiffs in writing  that the employer or the examinee may (with mutual knowledge) make a recording of the test.

42.    Defendant Eileen Zeidler failed to comply with 29 USC § 2007 (b)(2)(D) which mandates that an examinee:

> (D) is read and signs a written notice informing such examinee--
> (i) that the examinee cannot be required to take the test as a condition of employment,
> (ii) that any statement made during the test may constitute additional supporting evidence for the purposes of an adverse employment action described in subsection (a),
> (iii) of the limitations imposed under this section,
> (iv) of the legal rights and remedies available to the examinee if the polygraph test is not conducted in accordance with this Act [*29 USCS §§ 2001* et seq.], and
> (v) of the legal rights and remedies of the employer under this Act [*29 USCS §§ 2001* et seq.] (including the rights of the employer under section 9(c)(2) [*29 USCS § 2008(c)(2)*]);

43.    Defendant Eileen Zeidler failed to comply with 29 USC § 2007 (b)(2)(E) which mandates that an examinee  provided an opportunity to review all questions to be asked during the test and is informed of the right to terminate the test at any time.

44.    Defendant Eileen Zeidler failed to comply with 29 USC § 2007 (b)(3) which mandates that during the actual testing phase, the examiner does not ask such examinee any question relevant during the test that was not presented in writing for review to such examinee before the test.

45.    Defendants  failed to comply with 29 USC § 2007 (b)(4) which mandates that before any adverse employment action, the employer shall (A) further interview the examinee on the basis of the results of the test; and (B) provide the examinee with– (i) a written copy of any opinion or conclusion rendered as a result of the test, and (ii) a copy of the questions asked during the test along with the corresponding charted responses.

46.    When employees requested information from the DEA regarding the polygraph

testing, these requests were not addressed by the DEA, but rather forwarded to Metropolitan defendants.

47.     Defendant B.A. advised a DEA supervisor that Metropolitan employees "failed" the polygraph for a reason.

48.     Metropolitan Defendants told the employees that they were not to discuss the polygraph with any DEA employee.  Defendants said that any questions regarding the polygraph were to be addressed only with Metropolitan.

49.     Defendant J.C. mandated that all of the employees' questions be directed to him, Defendant M.L., Defendant L.L .and Defendant R.P.

50.     J.C. specifically forbade any communication regarding the polygraph between the employees and DEA.

51.     When employees complained to the DEA regarding the polygraph, within a few minutes, Defendant B.A. called the office, scolding the employees for speaking to DEA agents regarding the polygraph.  B.A. threatened to write them up if she found out who had discussed the polygraph with the DEA.

52.     Defendant J.C. approved, endorsed, ratified, and enforced the taking of the polygraphs by Metropolitan employees.

53.     Defendant J.C. provided false and incomplete information to employees regarding the legality of the polygraph testing, and approved the polygraph testing in violation of law.

54.     Defendant L.L., the head of Human Resources, approved, endorsed ratified, and enforced the polygraph testing.

55.     Defendant R.P., a supervisor at Metropolitan, approved, endorsed ratified, and enforced the polygraph testing.

56.     Defendant R.P. placed the Plaintiffs on "laid-off status"  and implemented the termination of employees.

57.     Defendant M.L., the supervisor of Defendant B.A, approved, endorsed, ratified, and enforced the polygraph testing.

58.     Defendant B.A. coordinated all polygraph tests, often changing the date and time of the tests without warning, and notifying some employees of the testing via text messaging on employees' cell phones during their days off.

59.     Defendant Eileen Zeidler, administered the polygraphs without complying with the provisions of the EPPA.

60.     Defendant Sondra Hester, a supervising agent with DEA, authorized, approved, endorsed, ratified and enforced the polygraph examinations.

61.     Defendant Darek Kitlinski, a supervising agent with DEA, authorized, approved, endorsed, ratified and enforced the polygraph examinations.

62.     Defendant William Sherman,  the Acting Special Agent in charge of the San Diego Division of DEA, authorized, approved, endorsed, ratified and enforced the polygraph examinations.

63.     Plaintiff M.G.   On July 6, 2011, Defendant B.A .told M.G. that he had to "cover" an evening shift.  Thirty minutes after reporting, Defendants B.A. and Eileen Zeidler instructed M.G. that he was to undergo a polygraph examination.  Defendant B.A. told M.G., "today is your turn."  No one had provided M.G. with any written materials regarding the examination.  M.G. had to submit to a four hour polygraph test as a condition of his employment.  During the pre-test, Defendant Eileen Zeidler lectured M.G. on what she thinks defines a "good person."  Eileen Zeidler then asked him about his relationships, whether he has ever cheated on a significant other; whether he has had sex with prostitutes; and whether he has had sex with minors.  After his examination, M.G. was escorted to his desk in front of all of his co-workers to retrieve his belongings.  Defendant Sondra Hester took M.G.'s badge and escorted M.G out of the building through the back door.  Metropolitan terminated his employment.

64.     Plaintiff F.M.   On July 8, 2011, Plaintiff F.M. felt ill and took a day off from work.  On that day, Defendant B.A. called him at home in the afternoon and told F.M. that he would need to come to work the following day, Saturday, July 9, 2011 to take a polygraph examination.  On July 9, 2011, F.M. came in to submit to the polygraph.  He was not feeling

well.  Immediately after F.M. clocked in, Defendant Eileen Zeidler came to take him into the polygraph room.  F.M. told Zeidler in response to her question that he had not eaten breakfast. Zeidler became visibly angry and told F.M. that he was irresponsible and wasting her time.  F.M. attempted to explain that no one had given him instructions about eating breakfast.  F.M. then told Zeidler in response to her question that he did not go to sleep until pretty late the night before, until about midnight.  Zeidler told him that F.M. should have known better; that he should have been a responsible person; and that he was wasting her time.  F.M. tried to explain that no one had given him instructions regarding sleep related to the polygraph. Defendant Eileen Zeidler asked F.M. questions during the pre-test phase whether he had cheated on his ex-wife. Zeidler asked personal questions regarding F.M.'s past relationship and family relationships and F.M.'s financial situation.  Zeidler told F.M. that if he ever lied or cheated in school, he could not work there.

65.     F.M. told Eileen Zeidler that he had back surgery several years before and could not remain in the same position for an extended period.  Despite this, F.M. was subjected to approximately four hours of polygraph testing.  During the test, F.M. felt dizzy and his head fell back.  Defendant Zeidler became angry and stopped the test.  Zeidler walked around the table and stood in front of F.M.; leaned in toward him; and yelled at him that he was not taking this seriously and that he was wasting her time.  F.M. explained that he was feeling unwell.  Zeidler told F.M. that he knew what he was there for and told him to "suck it up" or words to that effect. After the conclusion of the test, Defendant Zeidler took F.M. into an interrogation room where he remained locked in for approximately 20 minutes.  F.M. was experiencing significant back pain so he sat on the ground.  When Zeidler came back and saw him sitting on the ground, she told him "Get up.  You are being a baby."  Zeidler took F.M. back into the polygraph room and asked for his badge.  Zeidler told F.M. that he did not pass the polygraph.  Zeidler told F.M. that he did not fail the polygraph.  Zeidler told him that she did not know what would happen to him given that his test was inconclusive and that he would be notified at a later time.  Another agent came in and escorted F.M. out of the building.  Metropolitan effectively discharged F.M. from

1    employment.

2        66.    Plaintiff L.A.    Defendant B.A. told L.A. that she was to take a polygraph test on

3    August 29, 2011. On August 10, 2011 however, Defendant B.A. told  L.A. that she would have

4    to take the exam the very next day, August 11.   No one provided L.A. with any written

5    documentation regarding the polygraph examination.   L.A. told Defendant Eileen Zeidler that

6    she had high blood pressure for which she was taking medication.  Zeidler told L.A. that this

7    would have no affect.  L.A. was told to wash her hands with warm water.  During the pre-test

8    phase of the examination, Zeidler asked her if she had engaged in sexual activity with animals.

9    Zeidler also inquired regarding L.A.'s boyfriend.   Zeidler did not provide a written copy of

10   questions to be asked.  When Zeidler put the wires on L.A., the equipment did not function

11   properly.  Zeidler struggled to alternate the band between L.A.'s leg and arm.  Eventually Zeidler

12   managed to place the band on L.A.'s left arm.  The bands were designed for smaller sized people

13   and it did not fit L.A. properly.  By this point, L.A. was starting to feel ill.   L.A.'s examination

14   lasted approximately five hours.  Once the examination was over, Eileen Zeidler left the room for

15   approximately twenty minutes.  Zeidler came back to the room and told L.A. that there was a

16   chance that she may have to retake the test but that she was checking L.A.'s results with

17   Washington D.C.  Approximately fifteen minutes later, Zeidler told L.A. that she failed the

18   polygraph.  Zeidler told L.A. that she had failed every question asked.  Zeidler proceeded to

19   interrogate L.A. by asking "Who are you working for?  Which drug cartel?"  Zeidler asked

20   repeatedly who had ordered L.A. to seek employment with DEA.  L.A. asked for a copy of her

21   polygraph test.  Zeidler told her no, that it was DEA property.  Zeidler left the interrogation room

22   which was locked from the outside.  L.A. was locked in the small interrogation room for

23   approximately one hour.   L.A. felt distress from the interrogation and from being locked in the

24   small space due to her claustrophobia.  Agents eventually allowed her to go to the bathroom to

25   clean herself.  They told L.A. that she lost her clearance to enter the DEA building and that she

26   would be laid off because there would be no work for her.   L.A. was terminated from her

27   employment at Metropolitan.

28

67.   <u>Plaintiff J.M.</u>  J.M.'s shift supervisor gave him a letter on August 1, 2011 that he would have to submit to a polygraph on August 22, 2011.  No one provided J.M. with any other written documentation regarding the polygraph examination.  The examination lasted approximately four hours and included a question regarding his sexual conduct and whether he cheated on his partner.   After J.M. took the polygraph, he was escorted out as if he had committed a crime.  The polygrapher told J.M. that he failed one question and asked J.M. to submit to a retest.  J.M. agreed to a retest.  No one set up a retest and Metropolitan terminated him from his job.

68.   <u>Plaintiff L.G.</u>  Defendant Eileen Zeidler made statements that employees would not be allowed to work until they took the polygraph.  Defendant B.A. told L.G. that  she was required to take a polygraph exam that was scheduled for September 13, 2011.   On Tuesday August 30, 2011, Defendant B.A. sent L.G. a text message on her private cell phone,  arbitrarily changing the date to that following Friday, September 2, 2011.  L.G. submitted to a three hour polygraph examination on September 2.  L.G. "failed" the test.  The next day, L.G. went into the wire room when Eileen Zeidler stormed into the room, irate that another employee had left without taking the polygraph.  Plaintiff L.G. was unnerved by Defendant Zeidler's emotional state.  Zeidler was ranting that it was unacceptable for the other employee to leave without submitting to a polygraph.  Zeidler told L.G. that she had left a message for the other employee and that she would take the call while L.G. was taking the test because "no one could get away with not getting polygraphed."  In the middle of L.G. being briefed, Zeidler took a call, took it outside, came back in and started the test again.   The printer was noisy and L.G. could not concentrate, which made her nervous, but Zeidler did not turn it off.  Zeidler told L.G. that she failed the polygraph.  Zeidler asked L.G. for her badge, escorted her out and asked L.G. if she had anything to tell her.  As L.G. was walking out of the elevator, Zeidler told L.G. that if she ever applied for any jobs that asked whether her clearance had been revoked, she would have to answer yes.  Plaintiff L.G. worked at the ICE office which did not request or require a polygraph examination.  In December of 2011, Metropolitan and/or DEA advised ICE of the results of the

1    DEA polygraph examinations.  Metropolitan effectively discharged L.G in  December of 2011.

2        69.    Plaintiff F.B.  On August 2, 2011,  Metropolitan shift supervisor gave F.B. a

3    facsimile notifying him that he was scheduled for a  polygraph on September 30, 2011.  No one

4    provided any other documents related to the polygraph.  On August 30, 2011, Defendant B.A.

5    sent F.B. a text message that read: "Fyi yur (sic) poly is rescheduled ok. Not sure when yet."  On

6    September 9, 2011, Defendant B.A. sent a text message to F. B. that read: "Yur (sic) polygraph is

7    scheduled for: 9/14 at 11:30am. Plz (sic) have yur (sic) DL avail and make a copy. And eat

8    before yur (sic) poly plz (sic)."   One minute later, Defendant B.A. sent F.B. yet another text

9    message that read: "Yur (sic) scheduled for PM shift in Carlsbad but a sup will cover it. Come

10   directly to div plz (sic)."   F. B. submitted to the polygraph on September 14, 2011 that lasted

11   approximately four hours.  The polygrapher, believed to be named "Sam" asked F.B. deeply

12   personal questions, including whether he ever received treatment from a mental health

13   practitioner.  After the examination was under way, the polygrapher  pulled up a chair and sat

14   directly in front of F.B.  "Sam" told F.B. that he was very scared of F.B. because he failed every

15   single question. Sam told F.B. that he was 100% untruthful and was hiding something.  Sam

16   accused him of being a criminal by asking  "who do you work for?"  He continued the

17   accusations and attempts to have F.B. confess to something through intimidation and forceful

18   tones for approximately 30 minutes.

19        70.    The polygrapher had a diagram with "infiltration" and "sensitive information" in

20   the center. The words were intended to point out possible sources of infiltration to which

21   sensitive information could be given. Some of these words and phrases included: FARC, Drug

22   Cartels, Foreign Political Groups and the press.  The polygrapher told F.B. "You  need to give

23   me  a name, you need to tell me something because otherwise everyone downstairs is going to

24   assume the worst of you."  He continued and said, "In order for me to help you, you need to help

25   me by telling me what you're hiding."  He also said, "Now is the time to confess and release all

26   that stress and worry you are carrying around."  Under tremendous stress and fear, not knowing

27   what was happening to him, F.B. gave the examiner the name his ex-girlfriend, a reporter.   He

28

14

asked F.B. whether the ex-girlfriend had persuaded him to get the job or if he had ever given her any information. The answer was again "No."   The polygrapher then concluded that it couldn't have been that which had caused the spikes in F.B.'s responses during the polygraph and accused F.B. of hiding something else.  This intimidation continued for another 15 minutes. F.B. told the polygrapher that he had nothing to hide and that he was in no way lying about anything and that he had nothing else to say.  The polygrapher continued to ask if F.B. wanted to add anything.  He then stopped the questioning and escorted him to an interrogation room down.  He locked the room and left F.B. inside for approximately thirty minutes.

71.   Defendant Sondra Hester and another agent named Barry entered the room.  These agents asked if F.B. was willing to write out a statement with anything that could help him in a possible re-test.  They asked F.B. about his ex-girlfriend who worked as a reporter.  They wondered how F.B. could have failed every single question and asked if there was anything he could tell them about his physiology that could explain the inconsistency.   Defendant Sondra Hester acknowledged F.B.'s lengthy dedication to the job, the respect he received from  his coworkers, supervisors and agents. Defendant Hester then asked for his access pass.

72.   Plaintiff M.N.  Defendant B.A. told M.N. via text message that she was to take a polygraph on September 15, 2011.  During a conversation with a polygrapher, M.N. asked what made DEA believe that the polygraphs were reliable.  The polygrapher told M.N. that this would not be the only time the linguist would be asked to take the polygraph.  M.N. told him that she would not submit to the test.  The M.N. provided a written statement to the DEA agent declining to take the polygraph.  M.N. stated in the letter that the actions of Metropolitan were in direct violation of the Employee Polygraph Protection Act. She stated that she had not been provided with reasonable written notice before the exam.  M.N. stated that she declined to take the test because both the test and the manner of testing were in violation of the law.  Because she declined to take the test, Metropolitan fired her.

73.   Plaintiff R.G.  In the summer of 2011, defendant B.A. told R.G. verbally that he would have to submit to a polygraph examination and that a date for the examination would be

given at a later time.   R.G. knew that, of the first eleven Metropolitan employees tested from El Centro, seven had "failed" and had been fired.   R.G. grew concerned as he found out that employees being tested were being called liars during the polygraph examinations.  On one occasion, Defendant B.A. told R.G. to take the polygraph exam the very next morning.   R.G. told Defendant B.A. that he had an appointment and could not do it on such short notice.  On another occasion, Defendant B.A. called R.G. shortly after his night shift had begun and instructed him to go home early because B.A. scheduled his polygraph examination the following morning.   Defendant B.A. told him that he would have to go home because they did not want to pay R.G. overtime since the administration of the polygraph would exceed his 40 hours for the week.  R.G. had car pooled with a co-worker who did not have a way home and could not leave early.  Defendant B.A. told him that she would reschedule his polygraph.  R.G. informed Defendant B.A. on or about November 6, 2011 (2 or 3 days before he was scheduled to take the exam) that he was not going to take the exam.  At the time, R.G. was working at ICE, which did not request or require that Metropolitan employees take the polygraph examination.  On December 21, 2011, while working at ICE, R.G. was informed that he was required to leave the site after he finished his shift that day.  Defendant L.L. notified R.G. that he was to return his identification card.  R.G. contacted Defendant B.A. regarding L.L.'s instructions and Defendant B.A. expressed regret that he would no longer be working at Metro.

74.   <u>Plaintiff L.S.</u>  On September 9, 2011, Defendant B.A. sent Plaintiff L.S. a text message stating " yur polygraph is scheduled for: 9/15 @ 8:30am. Plz have yur DL available and make a copy.  Wear flats and eat before yur poly plz."  On September 12, a supervisor told LS that the exam would be rescheduled.  On November 4, 2011, BA sent LS a text stating, " yur scheduled for yur poly on wed @ 11:30. Go to work as scheduled and lv around 10:30, eat before u come ok?  Did I give u the letter w instructions."   However, on November 8, 2011, B.A. sent L.S. a text canceling the test.  Later that day on November 8, 2011, B.A. called L.S. and told L.S. to take the polygraph on November 22, 2011.  On November 16, 2011, B.A. sent L.S. an email stating "unfortunately I have to cancel polygraph for next week.  The polygrapher had an

emergency and will not be available.  I will contact you as soon as the polygrapher give me her

availability."   The next day, November 17, 2011, B.A. told L.S. that she would be taking the

polygraph on November 22, 2011 after all.  On November 22, 2011, B.A. sent a text to L.S.

stating, "Miss Lydia. Plz come to div tomorrow @ 9 for yur poly. Ahora si! So just come straight

here. No need to go to carlsbad."   On November 23, 2011, B.A. sent a text to L.S. stating,  "

Buenos dias. When u get to the office clock in under neiremeirs case plz and make a copy of yur

DL. And just wait for Eileen."

      75.    Plaintiff L.S. submitted to the polygraph examination.  When L.S. arrived for her

examination, some of her coworkers were being cordial towards Defendant Eileen Zeidler.

Eileen Zeidler asked, "Wow, what did you do?  Did you murder somebody? Because they are

being nice to me." This interaction made L.S. very uncomfortable. During the pretest, Defendant

Zeeidler asked questions regarding L.S.'s ex-husband and the reasons for the divorce.  Defendant

Zeidler asked a series of questions whether L.S. had had any problems or issues with neighbors,

co-workers, law enforcement, or employer.  L.S. notified Defendant Eileen Zeidler that she had

high blood presure, but Defendant Zeidler told her that did not matter.  Zeidler placed all the

wires on L.S.  There was a malfunction with the equipment so Zeidler replaced a part.  L.S. told

Zeidler that she was having trouble breathing because the wires or bands were too tight around

her chest.  Zeidler loosen them up a little, but they were still too tight throughout the

examination.  After the examination, Zeidler asked if there was something L.S. was worried

about because there were some things that were "questionable."  L.S. told her there was not.

Zeidler failed to inform L.S. which answers were "questionable" or what questions L.S. failed.

Zeidler said she was going to send the results to headquarters to get a second opinion and if they

needed to re-take the test she would call L.S. back.   After the test, Defendant B.A. told L.S. to

return to work.  An hour later, B.A. called L.S. and told her to give her badge to her supervisor

and leave the building.

      76.    <u>Plaintiff E.R.</u>: On March 12, 2012, B.A. told E.R. that his polygraph had been

scheduled for March 18, 2012 at 9 a.m.  B.A. requested that E.R. go to the DEA office to submit

to the testing.  E.R. was working for ICE, not DEA.  At the time that E.R. took the polygraph in March of 2012, E.R. had not worked for the DEA since late August 2011 and had worked exclusively with ICE.  When E.R. went to get polygraphed, Defendant Eileen Zeidler said something to the effect, "I guess [Defendant B.A.] is in need of people because she keeps sending me people."

77.     During the pre-test phase, Defendant Eileen Zeidler gave E.R. a list of crimes and asked if E.R. had committed any of them. This list included a question whether E.R. engaged in sex with animals.  During the polygraph examination, Zeidler told E.R. that he had "problems" with some of the questions. She said she was having issues reading his trustworthiness. She repeatedly asked questions related to cheating or lying at work.  Zeidler did not specify if E.R. passed or not and said she had to send the results to headquarters for review.   A few days later, Defendant B.A. sent E.R. an email, telling him that Sondra Hesler wanted to meet him at DEA Division regarding the polygraph results. B.A. would not tell him whether he had passed.

E.R. met with Defendant Sondra Hester.  Hester told E.R. that it was surprising he was in this situation and asked if there was anything he wanted to discuss with her.  E.R. told her there was nothing to say, and that he had told the truth during the polygraph.  Hester told E.R. that he did not pass the test and again asked if he had anything to tell them. E.R. told her that everything had been said during the polygraph and that he had told the truth.  Hester told E.R. that he no longer had access to DEA facilities.  Hester asked E.R. to turn in his badge and left the room.

78.     Defendants constantly changed the dates of the employees' polygraphs without notice, adding to the widespread anxiety that they could be terminated at any given moment.

79.     Metropolitan and its officials forbade the employees to speak to any DEA official about the polygraphs and mandated that they speak only to Defendant B.A. and other Metropolitan supervisors.

80.     Submission to the polygraph was part of Plaintiffs' employment by Metropolitan. The polygraphs were administered during work hours and the employees were paid for their time spent undergoing the polygraph examination.

81. Metropolitan effectively fired all employees who "failed," had inconclusive test results, or refused the test.

82. The DEA had no legal right to administer polygraph tests to Plaintiffs, who were employees not of the United States, but of Metropolitan. The EPPA prohibited the DEA from administering the polygraphs in this case under *inter alia*, 29 CFR § 801.10. Metropolitan aided and abetted DEA in violating the statute. Metropolitan's actions were independently in violation of the EPPA.

83. Under the EPPA, any waiver of rights guaranteed by 29 USCS §§ 2001 *et seq.* is prohibited. The rights and procedures may not be waived by contract or otherwise, unless such waiver is part of a written settlement agreed to and signed by the parties to a pending legal action or complaint under 29 USCS §§ 2001 *et seq.*

84. Metropolitan and its officials provided ICE with a list of names of employees who had "failed" the polygraph or refused to submit to it.

**V.**
**FIRST CAUSE OF ACTION**
**VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT**
**29 USC § 2002 (1)**
**(Against All Defendants)**

85. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

86. 29 USCS § 2002 provides in relevant part:

> Except as provided in sections 7 and 8 [*29 USCS §§ 2006*, *2007*], it shall be unlawful for any employer engaged in or affecting commerce or in the production of goods for commerce--

> (1) directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test

87. Plaintiffs had a firmly established right under the Employee Polygraph Protection Act (EPPA), which prohibits employers from using any lie detector tests either for pre-employment screening or during the course of employment.

19

88.     Metropolitan is not entitled to an exclusion from the coverage under the EPPA because it is a private company.

89.     DEA in not entitled to an exclusion from the EPPA because Plaintiffs were not its direct employees.

90.     Defendants required, requested, and/or suggested that Plaintiffs take or submit to a lie detector test.

91.     Defendants directly and indirectly caused Plaintiffs to submit to a lie detector test.

92.     Defendants United States, Hester, Kitlinski and Sherman promulgated and/or authorized policies and procedures which called for the administration of the polygraph.

93.     Defendant Zeidler administered the polygraph examinations.

94.     Metropolitan,  J.C., L.L.,  R.P., M.L, and B.A. authorized the administration of the polygraphs, directly or indirectly requested that Metropolitan's employees submit to testing; and caused the testing to occur.

95.     As a direct and proximate result of Defendants' actions, Plaintiffs were subjected to humiliation, fear, loss of income, loss of reputation, loss of employment, and pain and suffering by the illegal acts of defendants and are entitled to compensatory damages, attorney fees and punitive damages.

**VI.**
**SECOND CAUSE OF ACTION**
**VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT**
**29 USC § 2002 (2)**
**(Against All Defendants)**

96.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

97.     29 USCS § 2002 (2) provides that it is unlawful for an employer "to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee."

98.     Defendants used, accepted and inquired about the results of the lie detector tests of the Plaintiffs.  Metropolitan Defendants inquired of results of the tests from DEA.  They accepted

and used them.

99.     Defendants disseminated the results to ICE.   Metropolitan and its officials provided a list of names to ICE of individuals who had "failed" or refused the examination.

100.     Defendants United States, Hester, Kitlinski and Sherman used the results of the polygraphs to terminate security access of the Plaintiffs.

101.     Defendant Zeidler used and referred to the polygraph examinations after she administered them and provided other DEA agents and Metropolitan the results of the polygraphs.

102.     Metropolitan, J.C., L.L., R.P., M.L, and B.A. used, accepted and inquired about the results of the lie detector tests to effectively terminate Plaintiffs from employment; process payroll; and manage unemployment status of Plaintiffs.  These Defendants communicated with other agencies and individuals regarding the results of Plaintiffs' polygraph examinations.

103.     As a direct and proximate result of Defendants' actions, Plaintiffs were subjected to humiliation, fear, loss of income, loss of reputation, dissemination of defamatory information, loss of employment, and pain and suffering by the illegal acts of defendants and are entitled to compensatory damages, attorney fees and punitive damages.

**VII.**
**THIRD CAUSE OF ACTION**
**VIOLATION OF EMPLOYEE POLYGRAPH PROTECTION ACT**
**29 USC § 2002 (3)**
**(Against All Defendants)**

104.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

105.     29 USCS § 2002 (3) provides in relevant part:

Except as provided in sections 7 and 8 [*29 USCS §§ 2006*, *2007*], it shall be unlawful for any employer engaged in or affecting commerce or in the production of goods for commerce--

(3) to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against--

(A) any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test, or
(B) any employee or prospective employee on the basis of

21

the results of any lie detector test...

106.    Defendants DEA, Zeidler, Hester, Kitlinski and Sherman assisted, aided and abetted Metropolitan and its officials in violating 29 USCS § 2002 (3).  They participated in the violation by terminating security clearance of Plaintiffs; authorizing and requesting the polygraph testing; and coordinating the discharge of Plaintiffs from employment.

107.    Metropolitan discharged, disciplined and discriminated against the Plaintiffs based on the results of the lie detector test or their refusal to submit to a test.

108.    Metropolitan threatened to discharge, discipline, or discriminate against Plaintiffs for refusal or failure to take or submit to a lie detector test.

109.    Metropolitan threatened to discharge, discipline, or discriminate against Plaintiffs on the basis of the results of a polygraph test.

110.    Metropolitan discharged Plaintiffs M.G., L.A., J.M., L.G., F.B. and L.S. for "failing" the polygraph.

111.    Metropolitan discharged Plaintiff F.M. for neither passing nor "failing" the polygraph.

112.    Metropolitan discharged Plaintiffs  M.N and R.G. for refusing to take the polygraph test.

113.    As a direct and proximate result of Metropolitan's actions, Plaintiffs were subjected to humiliation, fear, loss of income, loss of reputation, loss of employment, and pain and suffering by the illegal acts of defendants and are entitled to compensatory damages, attorney fees and punitive damages.

## VIII.
## FOURTH CAUSE OF ACTION
## CIVIL CONSPIRACY TO VIOLATE THE EPPA
### (Against All Defendants)

114.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

115.    Defendants entered into a conspiracy to violate the EPPA by jointly acting to cause

the administration of polygraph examinations to Metropolitan employees; to use the results of those polygraphs; to disseminate those results; to discharge employees based on the polygraph results; and to violate the EPPA.

116.    These Defendants engaged in a joint venture, a common plan or scheme, and a civil conspiracy to violate multiple provisions of the EPPA.

117.    These wrongful act or acts were done pursuant to the agreement between the Metropolitan, the individually named Defendants, the DEA and DEA personnel.

118.    Each Defendant, as a member of the conspiracy, acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, which was to engage in acts that violated the EPPA.

119.    These Defendants committed overt acts to further the conspiracy. In furtherance of their unlawful agreement, Defendants committed the following overt acts, among others:

    a.    Defendant B.A. coordinated the scheduling of the polygraph examinations of Metropolitan employees by email, text, verbal requests and facsimiles.

    b.    Defendant B.A. often changed the date and time of the tests without warning, notifying some employees of the testing via text messaging on employees' cell phones during their days off.

    c.    Defendant B.A. told a DEA supervisor that employees failed polygraph tests "for a reason."

    d.    Defendant J.C. mandated that all of the employees' questions be directed to him, Defendant M.L., Defendant L.L.and Defendant R.P.

    e.    Defendants B.A. and J.C. forbade any communication regarding the polygraph between the employees and DEA.

    f.    Defendant J.C. provided false and incomplete information to employees regarding the legality of the polygraph testing, and approved the polygraph testing in violation of law.

    g.    Defendant R.P. placed the Plaintiffs on "laid-off status"  and implemented the termination of employees.

    h.    Defendant R.P. disseminated the results of the polygraph examinations to officials of ICE.

    i.    Defendant Eileen Zeidler administered polygraph examinations.  She asked highly inappropriate and offensive questions to some of the examinees.

j.      Defendants United States, Hester, Kitlinski and Sherman promulgated the policy of polygraphing Metropolitan employees.

k.      Defendants United States, Hester, Kitlinski and Sherman authorized the polygraphs of Metropolitan employees.

120.    Defendants are joint tortfeasors.  They are liable for all damages ensuing from the wrongs committed by their co-conspirators, irrespective of whether or not they were direct actors and regardless of the degree of their activity.

121.    As a result of the conspiracy, Plaintiffs suffered damages in the amount to be proven at trial.

**IX.**
**FIFTH CAUSE OF ACTION**
**FRAUD**
**(Against Defendants B.A. J.C., R.P. and Metropolitan, and Does 1 to 20)**

122.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

123.    Defendants made false material representations to Plaintiffs in order to induce plaintiffs to submit to polygraphs when Plaintiffs had no obligation to do so and Defendants acted illegally in requesting, suggesting and requiring Plaintiffs to take a polygraph examination.

124.    Defendants B.A. and J.C. represented to Plaintiffs that the polygraph examinations were legitimate and could be legally required.

125.    Defendants B.A. and J.C. represented to Plaintiffs that the polygraph examinations were being required by the DEA and that the DEA was legally permitted to do so under the EPPA.

126.    Defendants represented to Plaintiffs that the EPPA did not apply to these polygraphs.

127.    Defendant J.C. falsely represented to plaintiffs that no employees would be "terminated unless there is a criminal act involved."

128.    Defendants J.C., and R.P. told plaintiffs that if they failed the polygraph or declined to take it, they would not be discharged, but would be permitted to work on other non-DEA projects, such as work for ICE.

24

129.    These statements were all false and known to be false by defendants at the time they made them.  Plaintiffs reasonably  relied on the representations in taking the polygraphs.

130.    After the polygraphs were taken or refused, Defendants falsely told several Plaintiffs that they were not discharged, but were merely "laid off."  Defendants claimed to Plaintiffs that Metropolitan had not dismissed them from employment, and that they could continue to work on any other available assignments in San Diego, including work for ICE on Title III intercepts.

131.    After Defendants had made these representations, Metropolitan supervisor R.P. disclosed to ICE a list of Plaintiffs' names and Social Security numbers.

132.    R.P. further disclosed to ICE Plaintiffs had been subjected to polygraph examinations; Plaintiffs either did not pass, or declined to take polygraph examinations; and that Plaintiffs no longer were employed on DEA projects.

133.    Thereafter, in response to Metropolitan's unlawful disclosures, ICE informed Metropolitan that it no longer wanted Plaintiffs to work on ICE projects.

134.    Metropolitan then falsely represented to Plaintiffs that ICE had independently terminated their access to ICE facilities. Metropolitan expressed its regrets, and continued to falsely maintain Plaintiffs were not fired, but that Metropolitan simply had no work on which Plaintiffs were cleared to work.

135.    This ploy was an attempt by Metropolitan to avoid legal liability by falsely claiming that ICE had acted unilaterally, and Metropolitan was not responsible.

136.    Plaintiffs had a right to rely on the representations of Defendants and as a direct and proximate cause, they lost their employment and were subjected to humiliation and damages as set forth in this complaint.

**X.**
**SIXTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(Against Defendants B.A., J.C., R.P. Metropolitan and Does 1 to 20)**

137.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same

herein.

138.    Defendants made representations set forth in paragraphs 124-128, 130 and 134 as to the material facts regarding the polygraph examinations.

139.    Defendant B.A. told Metropolitan employees that they had nothing to worry about. B.A. told employees that if they had nothing to hide, they had nothing to fear from taking the test. B.A. made a statement that people failed polygraphs for a reason.

140.    These representations were untrue.

141.    Defendants negligently made these untrue representations.

142.    The representations were made with the intent to induce Plaintiffs to rely upon them.

143.    Plaintiffs were unaware of the falsity of the representation and acted in reliance upon the truth of the representation.  Plaintiffs were justified in relying on Defendants' representations.

144.    Defendant Metropolitan is liable under *respondeat superior* for the negligent misrepresentation of its employees.

145.    As a result of the reliance upon the truth of the representations, Plaintiffs sustained damage in an amount to be established at trial.

**XI.**
**SEVENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendants Eileen Zeidler, Sondra Hester, B.A., J.C., R.P. Metropolitan, and Does 1 to 20)**

146.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

147.    By engaging in the acts alleged herein, Defendants engaged in outrageous conduct with an intent to, or a reckless disregard of the probability of causing, Plaintiffs to suffer emotional distress.

148.    Defendants inflicted emotional distress on Plaintiffs by wrongfully authorizing, requesting, demanding, and coordinating the polygraphs; by terminating Plaintiffs' employment;

1   and by improperly using the results of the polygraph examination.

2        149.    Defendant Eileen Zeidler engaged in outrageous conduct by asking highly

3   improper, personal and humiliating questions during the administration of the polygraph.

4        150.    Defendants Eileen Zeidler and Sondra Hester treated some of the Metropolitan

5   employees like criminals; caused people to be escorted out of the building; and accused them of

6   sharing law enforcement sensitive information.

7        151.    As a direct, proximate and foreseeable result, Plaintiffs suffered severe emotional

8   distress and the outrageous conduct was the cause of the emotional distress suffered by Plaintiffs.

9        152.    The conduct of Defendants also amounts to oppression, fraud or malice and was

10  undertaken in deliberate disregard of Plaintiffs' rights.  Punitive damages should be assessed

11  against each Defendant for the purpose of punishment and for the sake of example.

12                                    **XII.**
                            **EIGHTH CAUSE OF ACTION**
13                                **NEGLIGENCE**
                            **(Against All Defendants)**
14

15       153.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same

16  herein.

17       154.    Defendants, their agents, servants and employees owed a duty of reasonable care to

18  prevent unnecessary harm to Plaintiffs.

19       155.    Defendants failed to act with reasonable care by authorizing, coordinating,

20  requesting, demanding, and administering polygraphs without making sure that they were

21  complying with federal laws.

22       156.    Defendants failed to act with reasonable care by not addressing the legitimate

23  concerns brought by employees regarding the legality of the polygraphs and by providing false

24  information.

25       157.    Defendants failed to act with reasonable care by failing to ensure that the

26  polygraphs were being conducted properly.

27       158.    Defendants breached their duty to exercise reasonable care by *inter alia*, by

28

1  demanding Plaintiffs be subjected to a polygraph test as a condition of employment or continued
2  employment.

3      159.    Defendants were negligent in their failure to properly explain the basis and
4  procedure to the employees.

5      160.    Defendant B.A. was negligent in unilaterally and constantly rescheduling the
6  polygraph tests without sufficient notice or warning to the employees.

7      161.    Defendants were negligent in their failure to follow proper statutory procedures; to
8  provide proper notice to the Plaintiffs; and to provide notice of Plaintiffs' rights.

9      162.    Defendant Metropolitan is liable under *respondeat superior* for the negligence of
10  its employees performed within the course of their employment.

11      163.    Defendants' breach of the duty of reasonable care caused damages to Plaintiffs, in
12  an amount to be established at trial.

13                                         **XIII.**
                                **NINTH CAUSE OF ACTION**
14                              **[INJUNCTIVE RELIEF]**

15      164.    Plaintiffs reallege  all prior paragraphs of this complaint and incorporate  the same
16  herein.

17      165.    Plaintiffs are informed and believe  and thereon allege  that, unless enjoined,
18  Defendants will continue to engage in the unlawful and tortious acts.

19      166.    Plaintiffs face  the real and immediate threat of repeated and irreparable injury and
20  continuing, present adverse effects as a result of the acts of the Defendants.

21      167.    Plaintiffs have effectively been terminated from their jobs at Metropolitan and
22  have lost their security clearance.  Plaintiffs are therefore unable to obtain similar employment
23  elsewhere.

24      168.    Plaintiffs have no adequate and complete remedy at law.

25      169.    Plaintiffs are entitled to equitable relief under 29 U.S.C. §2005.

26      170.    Plaintiffs seek an order of the Court reinstating them to their employment,
27  requiring the destruction of all records of polygraph results in Metropolitan's possession, and

28

1   enjoining Metropolitan from dissemination of polygraph information.

2

## XIV.
## PUNITIVE DAMAGES

4          Defendants acted in deliberate disregard of Plaintiffs rights under the Employee Polygraph

5   Protection Act.  They acted with oppression, fraud or malice and punitive damages should be

6   assessed against each Defendant, with the exception of the United States of America, for the

7   purpose of punishment and for the sake of example.

8

9          WHEREFORE, Plaintiffs pray  as follows:

10      1.      For general and special damages according to proof at the time of trial;

11      2.      For past and future lost wages and benefits and reinstatement of Plaintiffs'

12   employment;

13      3.      For restoration of seniority rights;

14      4.      For expungement of record of the polygraph from the Plaintiffs' personnel files;

15      5.      For costs of suit and interest incurred herein and attorneys' fees pursuant to 29

16              U.S.C. §2005;

17      6.      For punitive damages; and

18      7.      Any further injunctive or declaratory relief this court deems just and proper.

19

20   DATED: October 26, 2012                    Respectfully submitted,

21                                              S/ *Eugene Iredale*

22                                              _____
                                                EUGENE G. IREDALE
                                                JULIA YOO
23                                              Attorneys for Plaintiff

24

25

26

27

28

29